UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/20/2025
```

------------------------------------------------------------------ X
                                     :

ELAINE GREENWOOD,                     :
                                       :

                       Plaintiff,     :              1:23-cv-10516-GHW
                                       :

                -v-                  :       <u>MEMORANDUM OPINION &</u>
                                       :                <u>ORDER</u>

AMERICAN KENNEL CLUB,           :
                                       :

                       Defendant.     :
                                       :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

      For over forty years, Plaintiff Elaine Greenwood was an internationally respected and award-winning dog breeder. Ms. Greenwood built her breeding and dog-showing business, Logres Farm, based upon her dedication to, and love for, her dogs. Ms. Greenwood's animals were her source of pride, and, ultimately, her downfall—allegedly used as leverage to keep Ms. Greenwood compliant and socially isolated so that certain individuals allegedly associated with the American Kennel Club ("AKC") could sexually assault and rape her for over three decades with impunity.

      Ms. Greenwood alleges that in 1995, and then again in 1996, she was raped by two men while she was attending AKC events in New York City. Ms. Greenwood alleges that both men were AKC "agents." One of the men, Stephen Daniel Gladstone—a former AKC board member and judge—allegedly continued to sexually assault Ms. Greenwood for over two decades, from the time of the initial 1995 rape until his death in 2017. Ms. Greenwood alleges that, sometime in 2000, Mr. Gladstone entered into an agreement with Ms. Greenwood's then-husband, Arthur Greenwood. Under the alleged agreement, Mr. Gladstone provided start-up funding for Mr. Greenwood's Doberman Pinscher and horse breeding business. In exchange for that investment money, Mr. Gladstone was given unfettered access to Ms. Greenwood to continue his alleged sexual abuse. To

further his access to Ms. Greenwood, in August 2005, Mr. Gladstone purchased a socially isolated and derelict property in Carthage, North Carolina. Refusing to abandon her animals, Ms. Greenwood was forced to live at this property for years where she remained within Mr. Gladstone's thrall. This saga culminated on February 25, 2015, when two AKC inspectors conducted an unannounced inspection of the Gladstone property and Ms. Greenwood's Dobermans. After the inspection, AKC cancelled the registrations of every dog ever bred by Ms. Greenwood.

On November 22, 2023, Plaintiff filed this action, asserting various state law claims arising from both her alleged 1995 and 1996 sexual assaults in New York City and from the alleged years of sex trafficking that occurred thereafter. Ms. Greenwood brings her claims—not against her alleged abuser Mr. Gladstone, or his estate—but AKC itself, arguing that AKC facilitated, aided, or otherwise failed to stop, Mr. Gladstone's continued assaults. Ms. Greenwood contends that her claims are timely under the New York State Adult Survivors Act ("ASA"), which "revived," for a one-year period, claims resulting from conduct which would constitute a sexual offense under New York criminal law.

The threshold question before the Court is whether Ms. Greenwood's claims are revived under the ASA. The subsidiary question is whether Ms. Greenwood has plausibly stated any claim against AKC itself. Because Ms. Greenwood filed her claims within the ASA's one-year revival window and because Ms. Greenwood has alleged a predicate sexual offense, Ms. Greenwood's claims are "revived" under the ASA. However, because Ms. Greenwood has not plausibly stated a claim against AKC predicated on the underlying assaults, Defendant's motion to dismiss is GRANTED.

## II.    BACKGROUND[1]

### A.    Factual Background

#### 1.    The 1995 and 1996 Rapes in New York City

Ms. Greenwood registered her first dog with the AKC in 1976, and bred her first litter shortly thereafter, producing two nationally ranked Great Danes.  Compl. ¶ 98.  Because Ms. Greenwood was interested in issues related to AKC governance more broadly, including AKC's tolerance of certain cosmetic surgeries performed on dogs, she became more involved with the organization.  FAC ¶ 35.

In early March 1995, Ms. Greenwood attended the Westminster Kennel Club dog show at Madison Square Garden.  Compl. ¶ 119.  One evening after group judging, Ms. Greenwood alleges that Mr. Gladstone, asked her to "meet him in an area behind the bleachers" to discuss "something urgent."  *Id.*  At the time, Mr. Gladstone, an attorney, was working at his own firm and had no formal affiliation with AKC.[2]  *Id.* ¶¶ 71, 72.  When Ms. Greenwood met Mr. Gladstone behind the bleachers, he "grabbed [her] arm, forced her into a gray concrete stairwell[,] and forcibly held her as he unzipped his pants. . . ."  *Id.* ¶ 119.  Ms. Greenwood does not allege that Mr. Gladstone consummated his attempted rape that day.  *See id.*  Days later, Mr. Gladstone apologized for his behavior, which he attributed to intoxication.  *Id.* ¶ 120.

---

[1] The facts relevant to this motion are drawn primarily from Plaintiff's fourth amended complaint.  Dkt. No. 28 ("FAC"), and are accepted as true for the purposes of this motion.  *See, e.g.*, *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Given Plaintiff's *pro se* status, the Court considers supplemental factual allegations made by Plaintiff in her initial complaint, Dkt. No. 1 ("Compl.") and in her opposition to Defendant's motion, Dkt. No. 38 ("Opp'n").  *See Collins v. Goord*, 438 F. Supp. 2d 399, 403 & n.1 (S.D.N.Y. 2006) (deeming factual allegations contained in *pro se* plaintiff's brief to "supplement" his pleading).

[2] Ms. Greenwood acknowledges that Mr. Gladstone did not become a member of AKC's board of directors until 1999.  Compl. ¶ 71 ("In 1995, four years before he was seated as a member of the AKC Board of Directors, Gladstone himself. . . ."); *see also* FAC ¶¶ 7, 9 ("[G]iving [Mr. Gladstone] even more power by allowing him to judge more Breeds [sic], more Groups, and eventually BEST in Show, allowed him to become a member of the AKC's Board of Directors. . . .").  And, as Ms. Greenwood points out, AKC sued Mr. Gladstone's firm in 1993 with respect to an alleged fraud in the AKC's studbook.  FAC ¶ 7 (citing *Am. Kennel Club v. Gladstone & Watkins, P.C.*, No. 4:93-cv-1221 (M.D. Pa. Apr. 29, 1993)).

Later in March 1995, Plaintiff and Mr. Gladstone attended an AKC event at the Southwind Hotel in New York City. FAC ¶ 33. On the last night of the event, Mr. Gladstone walked Ms. Greenwood back to her hotel room. *Id.* When Ms. Greenwood opened her door and turned to say goodnight, Mr. Gladstone allegedly "forced his way in, threw her on the bed," and raped her. *Id.* After the rape, Mr. Gladstone allegedly continued to harass Ms. Greenwood by phone and email, often leaving graphic voicemail messages detailing the sexual acts that he wanted to perform. *Id.* ¶¶ 39, 50. In those messages, Mr. Gladstone threatened Plaintiff to keep quiet about the rape. *Id.* (asserting that Mr. Gladstone would state that he was "a fool to let [her] get away").

In the months following the rape, Ms. Greenwood reported Mr. Gladstone's conduct to other individuals she believes were "AKC agents" including Jay Phinizy, Wallace Pede, and Bill Shelton.[3] *Id.* ¶ 37. In the summer of 1995, Plaintiff shared one of Mr. Gladstone's voicemails, in

---

[3] The Court understands that Ms. Greenwood believes that these individuals were AKC "agents" at the time Ms. Greenwood reported Mr. Gladstone's conduct, but Ms. Greenwood has not alleged facts to support that any of these individuals were either AKC agents or employees. FAC ¶ 37 ("In the months following the rape by Gladstone, Plaintiff reported the rape to AKC agents. . . ."). Under New York common law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.*, 266 F.3d 112, 122 (2d. Cir. 2001). "Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking[,] and the understanding of the parties that the principal is to be in control of the undertaking." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)). "On a motion to dismiss, the relevant inquiry is 'whether plaintiff has made specific allegations from which an agency relationship can be inferred.'" *SING for Serv., LLC v. DOWC Admin. Servs., LLC*, No. 20-cv-5617 (GHW), 2022 WL 36478 at *18 (GHW) (S.D.N.Y. Jan. 3, 2022) (quoting *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011)).

Nowhere in her FAC does Ms. Greenwood allege any facts sufficient for the Court to infer that any of the individuals to whom she reported Mr. Gladstone's conduct had either an agency or employer-employee relationship with AKC. Ms. Greenwood makes conclusory allegations that these individuals are AKC agents. FAC ¶ 211 ("At all times related to this action, the individuals listed below were agents of the AKC, acting within the scope and authority of their status as agents of the AKC. . . ."). But on a motion to dismiss, the Court does not accept unsupported legal conclusions as true, even when those conclusions are made by a *pro se* litigant. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Specifically, Ms. Greenwood alleges that Mr. Pede was an AKC judge and "officer of an AKC member club." *Id.* ¶ 39. Ms. Greenwood alleges that Mr. Shelton was an AKC judge. *Id.* ¶ 231. And Ms. Greenwood alleges that Mr. Phinizy was an "AKC Delegate," AKC board member, and "AKC agent and Westminster member." *Id.* ¶¶ 43, 228. Nowhere in her FAC does Ms. Greenwood allege when these individuals allegedly became formally affiliated with AKC or that they were so affiliated when Ms. Greenwood reported the assault. Nor does Ms. Greenwood allege any facts to support that AKC judges, board members, or AKC member club officers have any formal agency or employment relationship with AKC by virtue of those positions. Indeed, although Ms. Greenwood does accurately state the elements, as described above, for determining whether an agency relationship exists under New York law, *id.* ¶ 211, Ms. Greenwood never alleges any facts sufficient for the Court to conclude that any of these individuals meet that standard. Nor does Ms. Greenwood allege any facts to support that either "AKC judges" or "officers of AKC member clubs" are

4

which he described the rape, with Mr. Pede and Mr. Shelton.  *Id.* ¶¶ 39, 41.  Mr. Pede allegedly remarked that "Gladstone was a lucky guy" and Mr. Shelton called the message "funny" but neither man offered Ms. Greenwood any assistance.  *Id.*  During this time, Ms. Greenwood also reported Mr. Gladstone's conduct to Mr. Phinizy.  *Id.* ¶ 43.

In February 1996, Ms. Greenwood attended the Westminster Kennel Club Dog Show, which was again held at Madison Square Garden.  *Id.*  While Ms. Greenwood was sleeping in her hotel room at the Penta Hotel, Ms. Greenwood's roommate and Mr. Phinizy entered the room; they appeared to be intoxicated.  *Id.*  Mr. Phinizy allegedly "crawled into Plaintiff's bed while she was waking," and raped her.[4]  *Id.*  During the show held the next day, Mr. Phinizy "pinned his Westminster KC gold member pin to Plaintiff's coat," further angering Mr. Gladstone, who was also attending the event.  *Id.* ¶ 45.  That evening during the terrier event, Mr. Gladstone cornered Ms. Greenwood and raped her.  *Id.* ¶ 46.  "Sickened and traumatized" by what she had experienced, Ms. Greenwood placed her current dogs, titled Giant Schnauzers she had bred, into homes as pets, and "abandoned any interest in the AKC or AKC events."  *Id.* ¶¶ 47–48.

### 2.  The "Sex-Trafficking" Arrangement

In 1999, Mr. Gladstone joined AKC's board of directors.  Compl. ¶ 71.  Plaintiff married Arthur Greenwood, an Air Force officer and medical student.  FAC ¶¶ 51–52.  In early 2000, Mr. Greenwood "became obsessed" with purchasing, breeding, and competing horses and Doberman Pinschers.  *Id.* ¶ 52.  This was an expensive obsession for a medical student, but Mr. Greenwood knew that Mr. Gladstone remained interested in his wife.  *Id.* ¶ 51.  Mr. Greenwood convinced Ms.

---

affiliated with AKC in a formal employer-employee relationship.  Because Ms. Greenwood has not alleged any facts that to support a formal agency (or employment) relationship, the Court cannot conclude that Mr. Phinizy, Mr. Pede, or Mr. Shelton were either AKC agents or employees at the time Ms. Greenwood alleges she reported Mr. Gladstone's conduct to them.  The fact that the FAC does not adequately plead that these individuals were AKC's agents does not affect the outcome of this opinion—dismissal would be appropriate even if Ms. Greenwood had adequately pleaded their status as AKC agents.

[4] Defendant admits that "Phinizy was a[n] [AKC] Board member at the time the alleged assault occurred."  Dkt. No. 37 ("Mem.") at 2.

Greenwood to borrow money from Mr. Gladstone to purchase a horse. *Id.* ¶ 52. Mr. Greenwood could not afford to pay Mr. Gladstone back for that loan. *Id.* ¶ 53. Instead, Mr. Greenwood agreed that Mr. Gladstone could freely "access" Ms. Greenwood so long as Mr. Gladstone provided funding for any future animal purchases. *Id.* Ms. Greenwood alleges that initially she was "not aware of true nature of the arrangement" and that if she asked her husband about his increasing debt, Mr. Greenwood became violent. *Id.* ¶ 55.

This arrangement continued through 2005, involving increasingly larger sums of money and increasingly frequent assaults. *Id.* ¶¶ 54–55. In March 2005, Ms. Greenwood reported Mr. Gladstone's conduct to her husband's "chain of command." *Id.* ¶ 61. A few days after that report, Ms. Greenwood learned how her husband was getting his money when Mr. Gladstone suddenly showed up at her home "demand[ing] to know who'd she spoken to about the 'arrangement.'" *Id.* ¶ 62. Mr. Gladstone stated that he "paid for [Ms. Greenwood] and owned her," and threatened that he would "destroy her" if Ms. Greenwood talked to anyone. *Id.* Ultimately, Ms. Greenwood was "left on her own to manage" the horses and dogs that her husband had purchased. *Id.* ¶ 57.

### 3. The Carthage, North Carolina Property

In August 2005, Mr. Gladstone purchased an isolated and "derelict" property in Carthage, North Carolina (the "Carthage Home") for Ms. Greenwood to live on with all of her husband's horses and dogs. *Id.* ¶ 65. Mr. Gladstone allegedly purchased this property to facilitate his access to Ms. Greenwood. *Id.* ¶¶ 66–74. The Carthage Home lacked adequate facilities for the horses—it did not have any fencing, pasture, or a barn. *Id.* ¶¶ 74, 91. And the Carthage Home lacked adequate facilities for Ms. Greenwood herself—the "70-year-old house had paper-covered [and] ungrounded electrical wiring, bad plumbing, asbestos, mold, no air conditioning, no heat, [and] leaky windows and roof." *Id.* ¶ 74; Compl ¶¶ 140–44.

Ms. Greenwood "was injured constantly" while residing at the Carthage Home. FAC ¶ 76.

6

Ms. Greenwood was injured by the horses, which she had difficulty handling because of the lack of adequate facilities to properly house them. *Id.* ¶ 92 (noting that Ms. Greenwood was kicked by a stallion in 2005 and almost killed in 2007 when two stallions fought over a mare). And Ms. Greenwood "was often sick" because of the conditions of the Carthage Home itself. FAC ¶ 103. "[B]ecause of the lack of heat . . . [Ms. Greenwood] [] us[ed] the oven on the main floor of the house to maintain a comfortable warmth in the room where the dogs were." *Id.* The rest of the house was entirely unheated, and Ms. Greenwood was "often forced to sleep in her car." *Id.*; Compl. ¶ 140. Ms. Greenwood was also often injured by Mr. Gladstone's alleged assaults. FAC ¶ 76; Compl. ¶ 139 ("Ms. Greenwood was treated like an appliance . . . endur[ing] years of violence, assaults, rapes, and other injuries.").

"By 2012 . . . Gladstone['s] interest in [] Plaintiff was waning," and most of the horses were sent to live at the trainer's barn. FAC ¶ 77. Although she did not actually own them, Ms. Greenwood "had come to love and depend [on] the animals." *Id.* ¶ 79. "[U]nder [Ms. Greenwood's] devoted care, the Logres Farm business had thrived and attained global success." *Id.*

### 4. The Air Force Investigation into Mr. Greenwood

Ms. Greenwood was fed up. In early 2014, she spoke with her husband's senior officer, sharing how her husband made his money and explaining the arrangement with Mr. Gladstone. *Id.* ¶ 81. On October 15, 2014, Mr. Greenwood learned that Ms. Greenwood was talking and threatened to kill her if she spoke to anyone else about the arrangement with Mr. Gladstone. *Id.* Ms. Greenwood ignored her husband's threats and continued to denounce him. *Id.* ¶ 86.

By December 2014, her husband's and Mr. Gladstone's threats no longer had the same force, and Ms. Greenwood was preparing to leave the Carthage Home. *Id.* Because Ms. Greenwood was "refusing to stay at Gladstone's property," Mr. Gladstone and Mr. Greenwood took back all the horses they had previously placed with a trainer in 2012—including a pregnant

mare and a nursing mare with a young foal—and dumped them at the Carthage Home.  *Id.*  Ms. Greenwood would not abandon the animals, but she also could not sell them because she did not own them.  *Id.* ¶¶ 88–91.

Around the same time in December 2014, the Air Force Office of Special Investigation ("OSI") began investigating Mr. Greenwood with respect to alleged tax fraud and evasion.  *Id.* ¶ 95. Ms. Greenwood fully cooperated with that investigation—providing the investigating officers with documentation, including videos of the Carthage Home, which she uploaded "privately" to YouTube, and agreeing to testify.  *Id.* ¶¶ 96, 100.  Mr. Gladstone demanded she take down the videos.  *Id.* ¶¶ 104–05.  Ms. Greenwood refused to do so.  *Id.* ¶ 108.  On February 23, 2015, one of Mr. Greenwood's superior officers informed her that her husband had been ordered to allow her to transfer or retain the animals at her discretion.  *Id.* ¶ 113.

### 5.  The 2015 AKC Investigation

Late in the evening on February 24, 2015, Ms. Greenwood was knocked to the ground by one of the horses and suffered a concussion.  *Id.* ¶ 115.  Ms. Greenwood texted Mr. Gladstone at about 4:00 a.m. to tell him that she had to go to the emergency room and that someone needed to come take care of the animals.  *Id.* ¶ 116.  And Ms. Greenwood contacted a neighbor who had previously helped with the animals; that neighbor arrived at the Carthage Home a few hours later. *Id.* ¶ 118.

Just as Ms. Greenwood was leaving, two AKC inspectors arrived unannounced at the Carthage Home.  *Id.* ¶¶ 119, 122.  Ms. Greenwood told the agents she was suffering from a concussion and needed medical care.  *Id.* ¶ 122.  One of the inspectors allegedly told Ms. Greenwood that if she went to the hospital AKC would "cancel the registration of every dog she had."  *Id.*  The inspectors denied Ms. Greenwood's request to return later in the day.  *Id.* ¶ 126.

Each of Ms. Greenwood's sixteen Dobermans was "stacked"[5] and inspected in turn.  *Id.* ¶¶ 129, 130.  The inspectors spent hours inside the Carthage House inspecting the property.  *Id.* ¶ 135.  Days later, Ms. Greenwood alleges that "AKC In-House Counsel Heather McManus instructed the President of the Doberman Pinscher Club of America to email all [] members" accusing Ms. Greenwood of animal abuse.  *Id.* ¶ 142.

Ms. Greenwood alleges that because of the delay in receiving medical care and because she was forced to engage in strenuous physical activity during the AKC inspection, she suffers from chronic traumatic encephalopathy.  *Id.* ¶ 132.  After the inspection, AKC cancelled the registrations of every dog Ms. Greenwood had bred.  *Id.* ¶ 137.  Plaintiff alleges that sometime in 2016, Mr. Gladstone went to the Carthage Home and removed all the animals—Ms. Greenwood has not seen those animals since.  *Id.* ¶¶ 270, 274.

### B.    Procedural History

Ms. Greenwood, proceeding *pro se*, filed her initial complaint on November 22, 2023.  *See generally* Compl.  Ms. Greenwood's initial complaint named AKC, and certain individuals associated with AKC, many of whom are North Carolina residents, as defendants.  *Id.* ¶¶ 55–63.  Ms. Greenwood did not name either Mr. Gladstone or his estate as a defendant.  *See generally id.*  In her initial complaint, Plaintiff claimed that Mr. Gladstone "sexually assaulted her at an AKC event in New York City in 1995, raped her at a New York City hotel in 1995, and then continued to sexually assault her in Carthage, North Carolina from 2005 until his death in 2017," as a result of the agreement between Mr. Gladstone and Mr. Greenwood giving Mr. Gladstone unfettered access to Ms. Greenwood.  Dkt. No. 4 at 1.

---

[5] In the world of competition dog sporting, to "stack" a dog means the process of positioning a dog's body to show a specific profile.  *See Glossary*, Am. Kennel Club, https://www.akc.org/about/glossary/ (last visited Nov. 7, 2025).  "Stacking" a dog involves bending up and down in a manner that may pose difficulty for an individual suffering from a concussion.  FAC ¶ 131 (noting that Ms. Greenwood was "repetitively bending down and standing up or being forced to lift a 65 to 75 pound animal").

Because some of the defendants named in Ms. Greenwood's initial complaint reside in North Carolina and because most of the events giving rise to Ms. Greenwood's claims occurred at her former North Carolina residence—where Ms. Greenwood asserts that she was forced to live in substandard conditions to facilitate Mr. Gladstone's access to her—Chief Judge Laura T. Swain, to whom the case was then assigned, concluded that venue was not proper in this District under either 28 U.S.C. § 1391(b)(1) or 28 U.S.C. § 1391(b)(2). *Id.* at 2. After first finding that venue was proper in the Middle District of North Carolina, Chief Judge Swain next balanced the 28 U.S.C. § 1404(a) transfer factors and determined that transfer to the Middle District of North Carolina was appropriate. *Id.* at 3. Accordingly, Chief Judge Swain transferred this action to the Middle District of North Carolina. *Id.* at 4. Chief Judge Swain granted Plaintiff leave to amend "to pursue state law claims against new defendants concerning the 1995 alleged rape." *Id.* at 4.

Ms. Greenwood sought reconsideration of the transfer order, arguing that the conduct underlying her claims occurred in New York City. *See generally* Dkt. No. 5. On December 9, 2024, Chief Judge Swain denied Ms. Greenwood's motion for reconsideration because, having already transferred all claims against all named defendants, "the Court no longer has jurisdiction of th[o]se claims." Dkt. No. 6 at 2.

Plaintiff filed her first amended complaint on January 8, 2025. Dkt No. 7. This Court was assigned to this case on February 4, 2025. On June 27, 2025, Defendant filed a motion to dismiss Plaintiff's first amended complaint. Dkt. No. 23. In response to Defendant's motion to dismiss, Plaintiff filed her second amended complaint on July 18, 2025. Dkt. No. 25. Three days later, Plaintiff filed her third amended complaint. Dkt. No. 27. The next day Plaintiff filed her FAC. Dkt. No. 28. Plaintiff's FAC is the operative complaint in this case. Plaintiff's FAC asserts the following causes of action against AKC: aiding and abetting violations of New York's Penal Law Chapter 130 ("Count I"); aiding and abetting sex trafficking in violation of 18 U.S.C. §§ 1591, 1595

("Count II"); intentional infliction of emotional distress ("Count III"); negligence and gross negligence ("Count IV"); fraud ("Count V"); coercion and witness intimidation ("Count VI"); conspiracy ("Count VII"); battery ("Count VIII"); defamation ("Count IX"); extortion ("Count X"); obstruction of justice ("Count XI"); theft ("Count XII"); and violations of 7 U.S.C. § 2303 ("Count XIII").

On August 29, 2025, AKC filed its motion to dismiss, in which it argues that Plaintiff's FAC should be dismissed in its entirety because Ms. Greenwood failed to comply with Chief Judge Swain's earlier order granting limited leave to amend only as to conduct that occurred in New York. Mem. at 11–13. Alternatively, Defendant argues that because Ms. Greenwood has failed to adequately allege a predicate sexual offense under the ASA, her claims are time-barred. *Id.* at 13–15. And Defendant argues that, even if her claims are not time-barred, all of Ms. Greenwood's claims against AKC fail as a matter of law because AKC had no knowledge of the alleged assaults until years after they occurred and because neither Mr. Greenwood nor Mr. Phinizy were AKC employees. *Id.* at 17–34.

Ms. Greenwood filed her opposition on September 25, 2025, in which she argues that AKC has improperly introduced evidence extrinsic to the pleadings and that AKC is "intentionally misstating facts." Opp'n at 1. On October 9, 2025, AKC replied, arguing primarily that Ms. Greenwood has failed to rebut any of its "dispositive arguments." Dkt. No. 41 ("Reply") at 1.

### III.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a

complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris*, 572 F.3d at 72 (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court must determine "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Ultimately, determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006)). A document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted). Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.*; *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially quoted in the complaint or on which plaintiff relied in drafting the complaint). "[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and it must be clear that "there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco*, 622 F.3d at 111 (quoting *Beer*, 463 F.3d at 134).

Because Plaintiff is proceeding *pro se*, the Court must liberally construe Plaintiff's submissions and interpret them "to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed' . . . ." (citation omitted)). Courts must afford *pro se* plaintiffs "'special solicitude' before granting motions to dismiss . . . ." *Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528, 536 (S.D.N.Y. 2014) (quoting *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994)). However, "the liberal treatment afforded to *pro se* litigants does not exempt a *pro se* party from compliance with relevant rules of procedural and substantive law." *Bell*, 980 F. Supp. 2d at 559 (internal quotation marks and citation omitted); *see also Rahman v. Schriro*, 22 F.Supp.3d 305, 310 (S.D.N.Y. 2014) ("[D]ismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements." (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997))).

Because Plaintiff is proceeding *in forma pauperis*, the Court has an obligation to determine whether to dismiss portions of her complaint *sua sponte*. The Court must dismiss a complaint filed *in forma pauperis* that "is frivolous or malicious," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). "As under the 12(b)(6) standard, [a plaintiff's] *pro se* status obligates [the] Court to read [the plaintiff's] papers liberally and to interpret them as raising the strongest arguments they suggest." *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 125 (E.D.N.Y. 2011).

## IV.    DISCUSSION

### A.    Plaintiff's Claims Arising From North Carolina Conduct Are Barred by the Law of the Case Doctrine

Because Ms. Greenwood has not presented an "extraordinary" reason to revisit Chief Judge Swain's earlier order transferring her first complaint in its entirety to the Middle District of North

Carolina, the law of the case doctrine precludes Ms. Greenwood from reasserting those same claims in her operative complaint. Dkt. No. 4 at 2–3. A court's prior orders are subject to the "law of the case doctrine" which provides that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Virgin Atl. Airways Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal citation omitted). A court "departs from the law of the case doctrine 'sparingly and only when presented with cogent and compelling reasons.'" *Carroll v. Trump*, 151 F.4th 50, 66 (2d Cir. 2025) (quoting *Palin v. New York Times Co.*, 113 F.4th (2d. Cir. 2024) (quoting *United States v. Aquart*, 92 F.4th 77, 87 (2d. Cir. 2024))). Because "there is a strong presumption against [the] amendment of prior orders," "a prior order usually may not be changed unless there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" *Bergerson v. N.Y. State Off. of Mental Health*, 652 F.3d 277, 288–89 (2d. Cir. 2011) (quoting *Virgin Atl. Airways Ltd.*, 956 F.2d at 1255).

Because Chief Judge Swain previously held that venue was not proper in this district for those of Ms. Greenwood's claims arising from conduct in North Carolina, that determination is binding on future proceedings in this case. Chief Judge Swain transferred the entirety of Ms. Greenwood's initial complaint to the Middle District of North Carolina because even though venue was not proper in this district, venue was proper in the Middle District of North Carolina, and because the § 1404(a) transfer factors favored North Carolina. Dkt. No. 4 at 2–3. Chief Judge Swain granted Plaintiff limited leave to amend with respect to conduct alleged to have occurred in New York—"to pursue state law claims against new defendants concerning the 1995 alleged rape." *Id.* at 4. Ms. Greenwood sought reconsideration of the transfer order, *see generally* Dkt. No. 5, which Chief Judge Swain denied, Dkt. No. 6 at 2.

Despite Chief Judge Swain's order, Ms. Greenwood's FAC reasserts many of those North

Carolina-based claims, based upon the same facts as originally pleaded in her initial complaint, that Chief Judge Swain previously transferred. "The mere filing of an Amended Complaint does not entitle Plaintiff to relitigate [her] claims absent new factual allegations." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015), *aff'd*, 626 F. App'x 20 (2d Cir. 2015). Just as in her first complaint, Ms. Greenwood's FAC brings claims based upon allegations that Mr. Gladstone "continued to sexually assault her in Carthage, North Carolina from 2005 until his death in 2017." Dkt. No. 4 at 1. "Because the FAC . . . is in large part identical to Plaintiff['s] first Complaint, the law of the case doctrine counsels against reconsideration" of Chief Judge Swain's earlier order transferring those North Carolina-based claims. *Weslowski*, 96 F. Supp. 3d at 316 (collecting cases dismissing amended complaints under the law of the case doctrine where the plaintiff raises largely identical claims in the amended complaint absent new factual support).

Ms. Greenwood does not argue that since Chief Judge's Swain's transfer order that there has been any intervening change of controlling law or the availability of new evidence sufficient to allow her to relitigate the venue issue now. *See* Opp'n at 8. Rather, Ms. Greenwood merely reiterates the same argument that Chief Judge Swain already rejected—that venue is proper in this District because AKC is headquartered here. *Compare* Opp'n at 8 ("AKC's decisions, including the 2015 inspection and defamation, were orchestrated by New York-based leadership."), *with* Dkt. No. 6 at 2. Ms. Greenwood has not shown, nor has she attempted to show, that any "extraordinary circumstances" justify revisiting Chief Judge Swain's earlier ruling beyond affording her another opportunity to relitigate these same issues based upon the same arguments that she made previously and which the court has already rejected once. *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) ("A court should be 'loathe' to revisit an earlier decision in the absence of extraordinary circumstances." (internal citations omitted)).

Because Ms. Greenwood has not shown any "extraordinary circumstances" justifying

revisiting the earlier venue determination, Ms. Greenwood's claims in her FAC which mirror those claims subject to Chief Judge's Swain's earlier transfer order are barred by the law of the case doctrine. Counts V–XIII are barred by the law of the case doctrine in their entirety because those claims only arise from the earlier-alleged North Carolina conduct such as allegations of abuse at the Carthage Home, the 2015 AKC investigation, and post-investigation conduct by AKC. None of those counts allege claims with respect to either the 1995 or 1996 rapes and attempted rape. Nor do those counts identify any new facts based upon any conduct that occurred in New York.

Count II is also barred in its entirety. In Count II, Plaintiff alleges that AKC violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), asserting that "[f]rom 1995 to 2015, Steven Daniel Gladstone, in concert with Arthur John Greenwood[], engaged in a sex trafficking venture." FAC ¶ 308. Plaintiff brought a nearly identical claim, based on the same underlying conduct, in her initial complaint. Compl. ¶¶ 379–424. Plaintiff's transparent attempt to recharacterize Count II as arising from the 1995 New York rape is not persuasive because Plaintiff admits that she did not meet her husband until 1999, when they were living in Maryland.[6] FAC ¶ 51. Count II itself explicitly states it does arise from any New York conduct; rather it arises from "rapes in 2005 in Fort Myers, Florida, and in 2010 in Raleigh, North Carolina." *Id.* ¶ 308. Accordingly, Count II is barred under the law of the case doctrine.

And, finally, Count I and Counts III–IV are partially barred by the law of the case doctrine to the extent that they allege claims that arise from the same North Carolina-based conduct and factual allegations that warranted transfer of Plaintiff's first complaint. Plaintiff's claims arising from the North Carolina-based conduct are pending in the Middle District of North Carolina. Plaintiff

---

[6] And in her opposition to Defendant's motion, Plaintiff similarly admits that Count II only asserts a claim with respect to conduct that occurred outside New York because it relates to the alleged arrangement between Mr. Gladstone and Mr. Greenwood—"Plaintiff alleges Gladstone and [Mr. Greenwood's] trafficking venture was known to AKC." Opp'n at 12.

remains at liberty to attempt to pursue any claims arising from conduct that occurred in North Carolina in that pending action. Ms. Greenwood just cannot pursue those claims here in this District. Accordingly, the remainder of this opinion discusses only those portions of Counts I and III–IV that assert claims against AKC with respect to Mr. Gladstone's and Mr. Phinizy's 1995 and 1996 New York-based conduct.

### B.    Plaintiff's State Law Claims Are "Revived" Under the ASA

Plaintiff's state law[7] claims against AKC would be time barred, unless they were revived by the ASA, which revives, for a window of time, certain otherwise time-barred claims, as described below. *See* Mem. at 13–17. Under the ASA—

> [E]very civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, . . . which is barred as of the effective date of this section because the applicable period of limitations has expired . . . is hereby revived.

N.Y. C.P.L.R. § 214-j. The one-year revival period under the ASA began on November 24, 2022. *Id.* ("[A]ction thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section."). Because Ms. Greenwood filed her initial complaint on November 22, 2023, her claims fall within the ASA's one-year revival window. *See generally* Compl. And Defendant does not dispute that Mr. Gladstone's and Mr. Phinizy's rapes as alleged in the FAC constitute offenses under the relevant penal law.

Defendant does, however, dispute whether the alleged rapes are "predicate sexual offenses"

---

[7] Even assuming the Court had concluded that Plaintiff's TVPRA claim was not barred under the law of the case doctrine, that claim could not be revived by the ASA. Plaintiff's TVPRA claim could not be revived by the ASA because it arises under federal law and the "ASA—as a state statute—cannot revive claims that are time-barred under a federal statute." *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 671 (S.D.N.Y. 2004) (citing *Holmberg v. Ambrecht*, 327 U.S. 392, 395 (1946) ("The Congressional statute of limitations is definitive.")). Because Ms. Greenwood's TVPRA claims are barred under the law of the case doctrine, the Court need not decide whether that claim would be time-barred absent ASA revival.

within the meaning of the ASA—arguing that in *Levin v. Sarah Lawrence College*, the court concluded that conduct was not a "predicate sexual offense" if the plaintiff failed to establish proximate causation. 747 F. Supp. 3d at 668. Defendant's reliance on *Levin v. Sarah Lawrence College*, while understandable, is misplaced because *Levin* does not hold that proximate causation is a separate and implicit requirement for reviving claims under the ASA. True, in that case Judge Liman stated that "even if Plaintiffs did adequately plead injuries suffered as a result of conduct that would constitute a sexual offense as defined in Article 130, Plaintiffs nonetheless do not allege that [the college] proximately caused Plaintiffs' injuries and therefore fail to allege that their state-law claims against [the college] 'arise from' those injuries." (noting that the "alleged injuries that occurred after Plaintiffs and [the alleged abuser] left [the college] are not predicate sexual offenses for the purposes of the ASA for three reasons" and identifying lack of proximate causation as the third reason). *Id.*

As Judge Liman made clear earlier in his opinion however, any discussion of proximate causation in his opinion related to the substantive requirements of the underlying tort and was not related to whether that claim is revived under the ASA. Judge Liman stated that premise of his opinion expressly—"it may be that neither [defendant] is liable for these torts . . . that will be as a function of the substantive elements of those tort claims, and not as a result of a separate limitation contained within the ASA." *Id.* at 663 (citing *Beter v. Baughman*, No. 24-cv-79, 2024 WL 1333570 at *11 (S.D.N.Y. Mar. 13, 2024), *report and recommendation adopted*, 2024 WL 1329066 (GHW) (S.D.N.Y. Mar. 28, 2024)). Accordingly, the Court only addresses issues of proximate causation in this case as relevant to determining whether Plaintiff has adequately alleged her underlying causes of action not in determining whether Plaintiff's claims are "revived."

And with respect to whether the ASA revives claims against AKC predicated on a sexual offense under the relevant penal law by either Mr. Gladstone or Mr. Phinizy—the ASA's text is clear that it revives claims against "any party" for injuries caused by conduct that qualifies as a sexual

18

offense.  *Beter*, 2024 WL 1333570 at *11.  The language "any party" "means that the ASA revives claims against one person predicated on a sexual offense by another person."  *Id.*  As courts in this district have noted, "[t]he ASA is claim- and injury-specific but not party-specific."  *Levin*, 747 F. Supp. 3d at 662 (citing *Beter*, 2024 WL 1333570 at *11).  Accordingly, the ASA revives Ms. Greenwood's state law claims against AKC predicated on the sexual offenses by Mr. Gladstone and Mr. Phinizy.

### C.    Plaintiff Fails to Adequately Plead an Aiding and Abetting Claim Against AKC

Plaintiff fails to state a claim against AKC for aiding and abetting either Mr. Gladstone's 1995 rape and attempted rape or Mr. Phinizy's 1996 rape because she does not allege any facts to suggest that AKC knew of either individual's conduct.  "The elements of a claim for aiding and abetting sexual assault and battery under New York law are (1) the existence of the underlying assault; (2) the defendant's actual knowledge of the underlying assault; and (3) the defendant's substantial assistance in carrying out the underlying assault."  *Beter*, 2024 WL 1333570 at *13 (citing *Doe 7015 v. Elektra Ent. Grp. Inc.*, No. 21-CV-6868, 2023 WL 2744102, at *4 (S.D.N.Y. Mar. 31, 2023) (quoting *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d. Cir. 2012))).  "In addition, aiding and abetting[] requires the defendant to know or intend that his conduct will substantially assist in [the underlying assault's] commission in order to be liable for aiding and abetting."  *Id.* (collecting cases). And "[s]ubstantial assistance requires that[] 'a defendant must have committed some overt act, either by words or conduct, in furtherance of'" the underlying tort itself—in this case the 1995 and 1996 rapes and attempted rape.  *Id.* (quoting *McKiernan v. Vaccaro*, 91 N.Y.S.3d 478, 481 (App. Div. 2019), then citing *Bigio*, 675 F.3d at 173).

Plaintiff has failed to state an aiding and abetting claim against AKC because Plaintiff has not plausibly alleged that AKC had actual knowledge of the underlying assaults at the time those assaults occurred.  First, Plaintiff has failed to plausibly allege that AKC had knowledge of Mr.

Gladstone's conduct.  In the months following Mr. Gladstone's 1995 assault, Ms. Greenwood

reported Mr. Gladstone's conduct to a handful of individuals she believes were AKC "agents."  FAC

¶ 37 ("Plaintiff reported the rape to AKC agents Jay Phinizy, Retired USAF Col. Wallace Pede, and

Bill Shelton.").  Even assuming those individuals might have had an obligation to report allegations

of misconduct to AKC directly because of their alleged respective relationships with AKC,[8] they had

no obligation to report Mr. Gladstone's conduct to AKC at that time because in 1995, Mr.

Gladstone himself had no formal affiliation with AKC.  FAC ¶ 7.  Rather, as Plaintiff admits, in

1995, Mr. Gladstone was working in private practice as an attorney and was an adversary to the

AKC in a then-pending legal matter.  *Id.* ¶ 249.  Plaintiff admits that she did not report Mr.

Gladstone's alleged assaults to AKC itself until 2015.  And nowhere does Ms. Greenwood allege that

anyone affiliated with AKC witnessed the assault.

Plaintiff's allegations that AKC "knew about the 1995 rape" and "knew that Steven Daniel

Gladstone was a dangerous man" because of that then-pending case between AKC and Mr.

Gladstone does not make it plausible that AKC had any knowledge of Mr. Gladstone's conduct.  As

Ms. Greenwood admits, that case had nothing to do with any allegations of sexual assault against

Mr. Gladstone.   Compl. ¶¶ 207–09 (noting that what was "at issue" were allegations that AKC

"engaged in fraud with respect to registering dogs . . . that the AKC knew were not deserving of

AKC registration").

---

[8] As noted above, *see supra* note 3 and accompanying text, Ms. Greenwood believes these individuals were AKC "agents" at the time Ms. Greenwood reported Mr. Gladstone's conduct.  But nowhere in her FAC does Ms. Greenwood allege facts to support the existence of any agency relationship between AKC and the individuals to whom she reported Mr. Gladstone's conduct.  Nor does Ms. Greenwood allege any facts to support that any affiliation or agency relationship existed between these individuals and AKC at the time when Ms. Greenwood reported the assaults.  And although Defendant admits that Mr. Phinizy was an AKC board member in 1996 at the time of his alleged assault against Ms. Greenwood, Mem. at 2, nothing in Ms. Greenwood's complaint indicates that Mr. Phinizy was a board member at the time Ms. Greenwood reported Mr. Gladstone's conduct.  Regardless, for the purpose of advancing Ms. Greenwood's arguments, the Court assumes, without holding, that there was either an agency or employment relationship between these individuals and AKC at the time of Ms. Greenwood's reports.  But even assuming that either an agency or employment relationship between these individuals and AKC existed at the time Ms. Greenwood reported Mr. Gladstone's conduct, Ms. Greenwood still has not adequately pleaded that AKC had any knowledge of Mr. Gladstone's conduct because Mr. Gladstone was himself a direct adversary of AKC at that time.

Second, Plaintiff does not allege any facts to suggest that AKC knew of Mr. Phinizy's assault. Plaintiff's FAC numbers approximately 370 paragraphs, and nowhere in that FAC does she allege that she ever reported Mr. Phinizy's alleged assault to anyone—an alleged AKC "agent," or otherwise. Accordingly, Plaintiff has failed to plausibly allege that AKC had actual knowledge of either Mr. Gladstone's or Mr. Phinizy's conduct at the time of the underlying assaults.

Plaintiff's aiding and abetting claim against AKC "fails for the additional reason that Plaintiff has not alleged that" AKC "substantially assisted" either Mr. Gladstone or Mr. Phinizy in sexually assaulting her. *Beter*, 2024 WL 1333570 at *13. For any assistance to be "substantial" it "must be directed at the tort itself." *Id.* at *14 (quoting *Doe 7015*, 2023 WL 2744102 at *4). Plaintiff's allegations that the AKC aided and abetted the 1995 and 1996 rapes by "ratifying misconduct," "promoting Gladstone to prestigious roles," and "canceling Plaintiff's . . . Doberman registrations on February 25, 2015," FAC ¶ 302, are insufficient because none of this conduct was "directed at the tort itself"—that is, the actual underlying assaults. *Doe 7015*, 2023 WL 2744102 at *4 (concluding that elevating a singer's stardom, acquiring additional distribution deals for his songs, and "fully embracing and promoting his music persona that was uniquely tied to pedophilia" was not conduct directed at the underlying sexual assault). And, even if any of AKC's conduct was calculated to "facilitate" Mr. Gladstone or Mr. Phinizy in the underlying assaults in an unspecified manner, as Ms. Greenwood argues, "merely [harboring a dangerous person] or giving tacit approval" of the underlying assault is not enough for assistance to be "substantial." *Beter*, 2024 WL 1333570 at *14 (quoting *Doe 7015*, 2023 WL 2744102 at *4 (quoting *Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 503–04 (App. Div. 1993))). Accordingly, the Court dismisses Plaintiff's claim against AKC for aiding and abetting the 1995 and 1996 alleged sexual assaults.

### D. Plaintiff Fails to Adequately Plead Intentional Infliction of Emotional Distress Claim Against AKC

Plaintiff fails to state a claim against AKC for intentional infliction of emotional distress

("IIED"") because Plaintiff has failed to adequately plead facts supporting either that AKC's conduct was sufficiently "outrageous" or that AKC had the requisite intent to cause any emotional distress. Plaintiff's IIED claim is predicated on the same conduct underlying her other claims, namely that AKC, through Mr. Gladstone and Mr. Phinizy, "engaged in extreme and outrageous conduct" namely, the alleged rapes and sexual assaults. FAC ¶ 314.

To state a claim for IIED under New York law, a plaintiff must plausibly allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019). IIED is a "highly disfavored [tort] under New York law." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 1578 (2d Cir. 2014). "Liability has been found only where the conduct [is] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (quoting Restatement (Second) of Torts § 46, comment d)). The New York Court of Appeals once observed that, of the IIED claims it had considered, "every one ha[d] failed because the alleged conduct was not sufficiently outrageous." *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 122 (1993).

Plaintiff has not pleaded any conduct by AKC that meets "the high threshold for conduct that is 'extreme and outrageous' enough to constitute IIED." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (quotation omitted). "Plaintiff does not bring this claim (or any of [her] claims) against" Mr. Gladstone or Mr. Phinizy—the individuals she alleges committed the sexual assaults. *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 378 (S.D.N.Y. 2017) (GHW). "Thus, the Court looks not to the allegations concerning those individuals' conduct, but rather to the alleged conduct of" AKC itself. *Id.* Ms. Greenwood's FAC makes clear that she faults AKC for "eventually giving

[Mr. Gladstone] even more power" by allowing him to judge more breeds, judge best in show, and become a member of AKC's board of directors.  FAC ¶ 7.  The Court cannot conclude that AKC's decision to continue affiliating with Mr. Gladstone was anything approaching the level of "extreme and outrageous conduct" required to adequately plead this "disfavored" tort.  *Beter*, 2024 WL 1333570 at *12 (holding that third party who introduced the plaintiff to a person who was an alleged sexual predator and warned that alleged assaulter not to touch the plaintiff was not sufficiently extreme or outrageous to support a claim for IIED); *Nungesser*, 244 F. Supp. 3d at 378.  Nor can the Court conclude that AKC's conduct in merely hosting the events during which the alleged assaults occurred is extreme or outrageous.  Accordingly, Ms. Greenwood has not alleged any AKC conduct that meets the extreme or outrageous element of her IIED claim.

And Ms. Greenwood has failed to plead any facts supporting an inference that AKC intended to cause her any distress.  *Id.*  As discussed above, Ms. Greenwood has not plausibly alleged that AKC had any knowledge of Mr. Gladstone's or Mr. Phinizy's conduct at the time the assaults occurred.  At most, Ms. Greenwood alleges that she reported Mr. Gladstone to other alleged "AKC agents"[9] in the months following the rape, but because Mr. Gladstone was himself not affiliated with AKC at that point, those individuals had no obligation to report his conduct to AKC itself.  And Ms. Greenwood never alleges that she reported Mr. Phinizy's conduct to anyone.  Because there is no indication that AKC had any knowledge of Mr. Gladstone's or Mr. Phinizy's conduct at either the time the rapes occurred, or when AKC promoted Mr. Gladstone, the Court cannot conclude that AKC had any intent to cause Ms. Greenwood distress.  Accordingly, because Ms. Greenwood has not adequately alleged either that AKC's conduct was extreme or that AKC had the requisite intent, the Court dismisses Ms. Greenwood's IIED claim against AKC.

---

[9] *See supra* notes 3 & 8.

### E.    Plaintiff Fails to Adequately Plead Negligent Supervision or Retention

At the outset, although Plaintiff's negligence and gross negligence claims are not artfully pleaded,[10] the Court construes the operative complaint as asserting a claim against AKC for negligent supervision[11] because AKC "failed to supervise its agents and protect Plaintiff from harm" and because it "failed to act on Plaintiff's reports of . . . [the] sexual assaults." FAC ¶ 319.  Ms. Greenwood has failed to adequately plead a negligent supervision or retention claim against the AKC with respect to either Mr. Gladstone or Mr. Phinizy.

 "Under New York law, a tort plaintiff seeking to prove a defendant's negligence must show: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"  *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023) (quoting *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021)).  "If the defendant owes no duty to the plaintiff, the action must fail."  *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir.), *as amended* (Nov. 23, 2015), *certified question accepted*, 26 N.Y.3d 1074, 23 N.Y.S.3d 151, 44 N.E.3d 226 (2015), *and answered*, 27 N.Y.3d 817, 37 N.Y.S.3d 750, 59 N.E.3d 485 (2016) (internal citations omitted)).

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show:  (1) that the tort-feasor and the

---

[10] Even if the Court were to construe Ms. Greenwood's claims as brought under a theory of *respondeat superior*, and assumes, without holding, that Mr. Gladstone and Mr. Phinizy were AKC employees at the time of the assaults, her negligence claims still fail because AKC is not liable under the doctrine of *respondeat superior* "for actions which were not taken in furtherance of the employer's interest and which were undertaken by the employee for wholly personal reasons." *Doe v. Alsaud*, 12 F. Supp. 3d at 677 (quoting *Galvani v. Nassau Cty. Police Indemnification Review Bd.*, 674 N.Y.S.2d 690 (2d Dep't 1998)). "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Id.* (quoting *Ross v. Mitsui Fudosan*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998)) (collecting cases).

[11] The Court notes that Ms. Greenwood cannot both raise a claim for negligent supervision and a claim for negligence under a *respondeat superior* theory based on the same factual allegations because "[a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment." *Rodriguez v. City of New York*, 594 F. Supp. 3d 534, 548 (E.D.N.Y. 2022) (quoting *Colodney v. Continuum Health Partners, Inc.*, 2004 WL 829158 at *8 (S.D.N.Y. Apr. 15, 2004)). "When an employee is acting within the scope of her employment, her employer may be held liable for the employee's negligence only under a theory of *respondeat superior*, and no claim may proceed against the employer for negligent hiring or retention." *Id.*

defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ahluwalia v. St. George's U., LLC*, 63 F. Supp. 3d 251, 263 (E.D.N.Y. 2014), *aff'd*, 626 F. App'x 297 (2d Cir. 2015) (unpublished) (quoting *Doe v. City of New York*, No. 09-cv-9895, 2013 WL 796014, at *3 (S.D.N.Y. Mar. 4, 2013), *aff'd*, 558 F. App'x 75 (2d Cir. 2014)).

Any negligent supervision or retention claim against AKC with respect to its alleged failure to supervise Mr. Gladstone fails because Mr. Gladstone was not employed by AKC at the time of the 1995 assaults nor did he have any formal affiliation with AKC in 1995. As Ms. Greenwood admits, at the time of 1995 sexual assault, Mr. Gladstone was not formally affiliated with AKC in any capacity. *See* FAC ¶¶ 7, 249. Rather, Mr. Gladstone was working as an attorney at a private firm. Compl. ¶¶ 71, 72. Because Ms. Greenwood has failed to show that Mr. Gladstone and the AKC had any employment relationship at the time of the New York City assaults, she had failed to plausibly allege a claim for negligent supervision against AKC with respect to Mr. Gladstone.

With respect to Mr. Phinizy—even assuming, without holding, that Mr. Phinizy was an AKC employee[12] at the time of the alleged 1996 rape, "the absence in the FAC of [any] factual allegations concerning [his] propensity for sexual assault and [Defendant's] knowledge is fatal to Plaintiff's negligence claim and warrants dismissal." *Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014).

---

[12] AKC acknowledges that Mr. Phinizy "was serving on AKC's Board of Directors at the time of the incident" but argues that, under AKC's bylaws board members are not AKC employees. Mem. at 13, n.5. In support of this argument, AKC appends to its motion to dismiss, relevant portions of AKC's bylaws. Ms. Greenwood argues that the Court may not consider AKC's bylaws which are not referenced in her FAC without treating Defendant's motion as a motion for summary judgment. "Generally, when a defendant attempts to counter a plaintiff's [c]omplaint with its own factual allegations and exhibits, such allegations and exhibits are inappropriate for consideration by the Court at the motion to dismiss stage." *Reyes v. Cty. of Suffolk*, 995 F. Supp. 2d 215, 220 (E.D.N.Y. 2014). AKC has not argued that the Court has any basis to consider its bylaws in deciding this motion. Accordingly, the Court declines to consider this document. *Chambers*, 282 F.3d at 154 ("Once the district court was presented with matters outside the pleadings, Rule 12(b) afforded two options. The Court could have excluded the extrinsic documents [or] . . . convert the motion to summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56.").

"Knowledge can be established directly, including through an employee's complaint . . . or constructively, as when sexual harassment is pervasive throughout the workplace." *O'Rear v. Diaz,* No. 24 Civ. 1669, 2025 WL 283169 at *6 (S.D.N.Y. Jan. 23, 2025) (citing *Sutherland v. Roman Cath. Diocese of Rochester*, 833 N.Y.S.2d 819, 820 (4th Dep't 2007); then citing *Vitale v. Rosina Food Prods., Inc.*, 727 N.Y.S.2d 215, 217 (4th Dep't 2001)).  Nowhere in her fourth amended complaint does Ms. Greenwood allege any facts to suggest that AKC had actual or constructive knowledge that Mr. Phinizy had any propensity for sexual assault.  And nowhere in her complaint does Ms. Greenwood allege that she ever reported Mr. Phinizy's conduct to AKC.  Accordingly, because Ms. Greenwood has failed to allege that AKC had any knowledge that Mr. Phinizy may be predisposed to sexual assault, she had failed to state negligent supervision claim against AKC with respect to Mr. Phinizy.

Plaintiff's negligent supervision claim against AKC with respect to both Mr. Gladstone and Mr. Phinizy fails for another, independent reason—because she specifically alleges that the alleged sexual assaults did not occur on AKC's premises.  Ms. Greenwood alleges that Mr. Gladstone's attempted rape and subsequent rape occurred at Madison Square Garden and the Southwind Hotel respectively.  Compl. ¶ 119; FAC ¶ 33.  And Mr. Phinizy's alleged sexual assault occurred at the Penta Hotel.  FAC ¶ 43.  Because Ms. Greenwood has not alleged facts showing that either Mr. Gladstone's or Mr. Phinizy's alleged sexual assaults occurred on AKC's premises, she has failed to state a claim for negligent supervision against AKC.  *Ehrens v. Luterhan Church*, 385 F.3d 232, 236 (2d. Cir. 2004) (affirming dismissal of negligent supervision claim against church when minister's sexual misconduct did not occur on church premises).

In sum, Ms. Greenwood has failed to adequately plead a negligent supervision or retention claim against the AKC with respect to either Mr. Gladstone or Mr. Phinizy.  Accordingly, the Court dismisses Ms. Greenwood's negligent supervision and retention claim against AKC.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  Plaintiff's claims for aiding and abetting sex trafficking in violation of 18 U.S.C. §§ 1591, 1595; fraud; coercion and witness intimidation; conspiracy; battery; defamation; extortion; obstruction of justice; theft; and violations of 7 U.S.C. § 2303 are barred under the law of the case doctrine.  Although Plaintiff cannot pursue those claims here, she can pursue those claims in the Middle District of North Carolina.  Plaintiff's claims for aiding and abetting violations of New York's Penal Law Chapter 130; intentional infliction of emotional distress; and negligence and gross negligence against Defendant AKC are dismissed without prejudice.

Because Ms. Greenwood is proceeding *pro se*, "[i]f a liberal reading of the pleading 'gives any indication that a valid claim might be stated,' this Court must grant leave to amend." *Briggs*, 819 F. Supp. 2d at 125 (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)).  Plaintiff is granted leave to file an amended complaint only to add new facts that will correct the deficiencies identified with respect to her three remaining state law claims for:  aiding and abetting violations of New York's Penal Law Chapter 130, intentional infliction of emotional distress, and negligence and gross negligence.  Plaintiff is directed that she cannot add any new claims to any amended complaint without prior leave from the Court.  Any amended complaint must be filed no later than thirty days from the entry of this order.

The Court requests that counsel for Defendant provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 36 and to mail a

copy of this opinion to Plaintiff by certified mail.

      SO ORDERED.

      Dated:  November 20, 2025
      New York, New York

                          GREGORY N. WOODS
                     United States District Judge